Filed 4/8/25  P. v. Arey CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | F086345/F087163 |
| Plaintiff and Respondent, | (Consolidated) |
| v. | (Super. Ct. No. VCF389311A) |
| STEVEN BRIAN AREY, | **OPINION** |
| Defendant and Appellant. | |

-ooOoo-

APPEALS from a judgment and order of the Superior Court of Tulare County. Nathan G. Leedy, Judge.

Janice M. Lagerlof, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Julie A. Hokans and Henry J. Valle, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Steven Arey was convicted by a jury of 20 counts of lewd and lascivious acts on a child under age 14.  There were three victims.  He appeals from the judgment of conviction and from the victim restitution order.  He challenges his

convictions, one of his fines, and two items of restitution. We agree with him that the $1,000 fine imposed under Penal Code section 294, subdivision (b), must be stricken, but we reject all his other claims. We accordingly order the abstract of judgment amended to reflect the stricken fine and otherwise affirm the judgment.

## STATEMENT OF THE CASE

Arey was charged in an amended information with 20 counts of lewd and lascivious acts on a child under 14 (Pen. Code,[1] § 288, subd. (a)). Counts 1 through 18 involved victim M.Y., count 19 involved victim J.S., and count 20 involved victim B.S. In connection with all counts, the information alleged the crimes involved multiple victims within the meaning of section 667.61, subdivisions (b) and (e). It also alleged as to all counts except count 18 that the victims were under the age of 14 years and Arey had substantial sexual contact with them (§ 1203.066, subd. (a)(8)).

A jury convicted Arey on all counts and found true all special allegations. On May 26, 2023, Arey was sentenced to consecutive terms of 15 years to life on each count for a total sentence of 300 years to life. The court also imposed, among other fines and fees, a $1,000 fine under section 294, subdivision (b). The court set a restitution hearing date.

Arey filed a notice of appeal from the judgment.

On October 27, 2023, the trial court held the restitution hearing. The court awarded $853,361.46 in restitution. This included $750,000 in noneconomic damages under section 1202.4, subdivision (f)(3)(F), split evenly among the three victims; $12,161.46 in relocation expenses for J.S.; and $91,200 in lost income to M.Y.

Arey appealed from the victim restitution order, and we ordered the two appeals consolidated.

---

[1] Undesignated statutory references are to the Penal Code.

2.

## FACTS

### I.   Prosecution's case

There were three victims in this case:  M.Y., B.S., and J.S.  M.Y., who is male, was born in 1988 and was 34 at the time of trial.  He has an older sister, B.S., who was born in 1987 and was 36 at the time of trial.  B.S. is married and thus now has a different last name than M.Y.  J.S., who is female, was born in 1986 and was 36 at the time of trial; J.S. is not biologically related to M.Y. and B.S.[2]

### A.   M.Y.'s testimony

M.Y. has two older, biological siblings, B.S. and Tiffany.  He also has a younger adopted sister and four stepsiblings.  His mother is Debi.  He lived with his mother, his stepfather, John H., and his three sisters in a house in Tulare.  His mother ran a daycare out of their home.  John had four children from a prior marriage—Tyson, Andrew, Jared, and Andrea—who lived mainly in Porterville with their mother.  Jared visited the H. house often, but the other three rarely visited.

M.Y.'s family, which was referred to during trial as the "H." family because of his stepfather's last name, was very close with the S. family.  In the S. family were Kevin Sr., Lauretta, "Little Kevin," J.S., and two other girls.  Debi, John, Kevin Sr., and Lauretta were best friends.  The two families attended Valley Bible Church in Visalia.  B.S. eventually married Little Kevin.

Arey was friends with Kevin Sr. and Lauretta, and M.Y. met Arey at church through the S. family.  Arey was a member of the church and became increasingly involved, eventually becoming a youth pastor.  At first, Arey primarily spent time with the S. family, so M.Y. mostly saw Arey only in passing.  Eventually, Arey began

---

[2] According to the probation department's presentence report, Arey was born November 29, 1970, making him 52 at the time of trial.

3.

spending more time with the H. family. He was at their house "all the time" and helped with the kids, especially M.Y.

M.Y. was 6 or 7 when he started spending time with Arey. By the time he was 8 or 9, Arey had become a father figure to him.[3] M.Y.'s parents were divorced and he did not enjoy a good relationship with his stepfather; Arey "took [him] under his wing." Arey was unmarried, had no children, and worked as a correctional officer.

Arey took M.Y. to movies and bought him things like video games, baseball bats and gloves, and really "anything [he] needed." They did lots of activities together, including playing video games, paintballing, dirt bike riding, and snowboarding. They would play video games together at Arey's home. Arey bought M.Y. a dirt bike and, when M.Y. became interested in snowboarding, his own snowboard. M.Y. estimated that he and Arey went on a hundred snowboarding trips. Some were day trips, others were overnight.

Whenever the S. and H. families spent time together, Arey was also there as he had become part of the "family." He primarily hung out with the kids at these get-togethers and often babysat them. M. loved Arey. Arey made him feel "great," cared for, and loved.

The first incident of sexual abuse occurred when M.Y. was 8 or 9 years old. M.Y. and Arey were at Arey's condominium in Tulare, about a mile away from M.Y.'s house. M.Y. spent lots of time there. When he was not in school and Arey was not working, they were usually at Arey's condo. Arey walked M.Y. back to his bedroom and said he had something to show him. Arey had M.Y. lie on the bed. Arey lay down next to him and turned on a pornographic video that M.Y. recalled involved "bondage"—"there was leather and whips." M.Y. felt "very uncomfortable" and pulled a blanket over himself.

---

[3] Arey is about 17 years, eleven months older than M.Y.

He had never seen pornography before. Arey asked if the video excited him, and M.Y. said it did not.

Arey turned off the video and brought out magazines depicting lesbian pornography. They began looking at the magazines, and M. became erect. Arey went to get condoms. Arey showed M.Y. how to unwrap and put on a condom. Arey did this by placing one over his own erect penis, which M.Y. saw. Arey showed M.Y. how to masturbate and told him it was part of growing up and of being a man. Arey then had M.Y. go into the bathroom with the magazines and masturbate. It was M.Y.'s first time masturbating. Arey coached him through the closed bathroom door, and M.Y. masturbated until he ejaculated into the condom. Arey then came into the bathroom and told M.Y. to flush the condom down the toilet. He also instructed M.Y. how to clean his penis with toilet paper. Arey then put the magazines away into a hallway closet, where they were kept in a black trash bag.

From this first incident until M.Y. was 13, M.Y. could not "even count the number of times" Arey showed him pornographic magazines, but says it was certainly over 50 times. He was also shown pornographic movies more than 50 times. The two of them also continued to masturbate together at Arey's home. Sometimes they would masturbate together with the magazines and ejaculate into towels. M.Y. watched Arey masturbate over 50 times, and M.Y. also masturbated in front of Arey over 50 times. M.Y. said he did not feel he had a choice to refuse to masturbate with Arey, but Arey never threatened him.

M.Y. recounted one of their snowboarding trips to Kirkwood ski resort, near Lake Tahoe. M.Y. was about 10 years old. They stayed at Arey's mother's house. They went out to watch a movie, and while on their way back to the house, Arey stopped at a sex store and said he was going to get something.[4] They returned to the house, had dinner,

---

[4] M.Y. gave conflicting accounts whether this store was in Sacramento or Tulare.

and watched a movie with Arey's mother. They went to bed, and Arey took out a box containing a sex toy. It was pink and had a simulated vagina on one end and an anus on the other. A man would insert his penis into either end and use it to masturbate. Arey said having someone else put their hand on your penis or using something else to ejaculate produced a different sensation. Arey made M.Y. hold the toy while Arey thrusted his penis into it until he ejaculated. Arey then went to clean it out and returned with it. M.Y. then used the toy on himself until he ejaculated, and then went to sleep in the same bed as Arey. M.Y. did not want to use the toy on Arey. After this incident, M.Y. became "more fearful" of what Arey would do to him next.

In Tulare County, M.Y. used the sex toy with Arey more than five times on separate days, and Arey used it with M.Y. more than 30 times on separate days. Eventually the toy became stretched out and stopped working well, so they began using their hands to masturbate each other. In Tulare County, M.Y. manually masturbated Arey more than 20 times on separate days, and Arey masturbated M.Y. more than 20 times on separate days. Sometimes they masturbated each other in the shower.

Many times while driving around in the car together, Arey would reach over and touch M.Y.'s leg and his penis, and M.Y. would become erect. This happened at least 10 times in Tulare County.

M.Y. said there were at least 20 times where they were sleeping in the same bed together and Arey pressed his erection into M.Y.'s leg and buttocks. Arey would lie next to M.Y. with his arm over M.Y., in a "spooning" position. Every time M.Y. was being spooned in bed, he was afraid of what Arey would do to him.

M.Y. also stated there were times with Arey in a swimming pool when they would be playing games of "truth or dare." On "multiple" occasions, Arey dared M.Y. to kiss his erect penis or buttocks under the water, which M.Y. did. Sometimes others would be present, primarily B.S. and J.S. These incidents happened when Arey was between 9 and 13.

M.Y. related an incident involving him and J.S. They were either at the S. family's house or Arey's house. They were playing games and having fun, and Arey wanted to play truth or dare. Arey then wanted to play a game he called "sex." M.Y. knew what sex was because of the pornography he had watched with Arey. Arey told M.Y. to get on top of J.S. and "dry hump her" while he watched. M.Y. and J.S. were clothed and on top of an air mattress. The game made M.Y. "happy" because it "felt good," and he had an erection. The incident lasted 10 to 15 minutes, and the three of them were the only ones in the room.

M.Y. also recalled a ski trip to Heavenly ski resort in Tahoe with Arey and B.S. This was the only snowboarding trip B.S. went on with them. They stayed either at a hotel or the resort lodge. There was only one bed in the room. When it was time to go to sleep, M.Y. decided to sleep on the outside and have B.S. sleep in the middle because he did not think Arey would do anything to her. The next morning, B.S. was "mad, upset," and "just pissed off," but M.Y. did not know why. They got off the chairlift at the first run, and B.S. took her snowboard off, sat down, and would not go down. Arey told M.Y. to go down so he could talk to B.S. B.S. eventually came down.

M.Y. was also asked about his childhood friend, T.S. They met when M.Y. was 10 or 11. They were best friends and spent all their time together. T.S. went on more than one snowboarding trip with M.Y. and Arey. M.Y. described a trip to Kirkwood where the three of them stayed at a hotel with a pool. They played truth or dare in the pool, and Arey had M.Y. kiss his penis and buttocks. M.Y. does not know if T.S. saw. Back at the room, the three showered off in their swimsuits. After the shower, the three snapped each other with towels as part of a game. They also ran around the room, and Arey was "pantsing" M.Y. and T.S. M.Y. saw T.S.'s penis become exposed. M.Y. said it was a "happy atmosphere" and they were "joking around." M.Y. later asked Arey about T.S.'s penis, and Arey explained that it was an uncircumcised penis. That night, M.Y. made T.S. sleep in the middle of the bed. M.Y. testified he remembered waking up

and seeing pornography on the television. He closed his eyes and tried going back to sleep and "not be a part of whatever was happening." He did not know if "anything else happened" to T.S. that night.

M.Y. told a detective in 2019 that he was not sure if the pornography incident in the hotel room happened; he did not know if it was reality or fantasy. He also did not remember telling the detective in 2019 that the three of them masturbated together in the hotel room.[5]

M.Y. had a girlfriend when he was 11 or 12 who he met at church. M.Y. would "make out" with his girlfriend in the backseat of Arey's car and touch her breasts while Arey drove. Arey eventually told M.Y. he did not need to sit in the backseat to do that with his girlfriend and said they could sit in the front seat. From then on, the two would sit up front, with M.Y. on the outside and the girlfriend in the middle. M.Y. would make out with her and touch her breasts.

Arey's relationship with M.Y. and the H. family ended about M.Y.'s freshman year of high school, when he was 13 or 14. This was also around the time that Arey had moved into a house across the street from the H. family.[6] Arey continued attending Valley Bible Church, and so did M.Y. until he started attending a new church to be with his friends. M.Y. occasionally would see Arey driving his car, but the two would not even wave at each other. M.Y. lived at the house across the street from Arey until he was 17 or 18.

M.Y. was afraid to tell anyone about what happened between him and Arey because Arey had promised to "come after" M.Y. or his family if he told anyone. M.Y.

---

[5] The detective testified that M.Y. told him in 2019 that he vividly remembered Arey putting his mouth on T.S.'s penis. But the detective spoke with T.S. and T.S. said nothing inappropriate happened between him and Arey.

[6] Arey lived in a condominium, then a house, and then the house across the street from the H. family. Most of the abuse happened at the first house—the house he lived in after the condominium.

believed the threat because Arey "was the type that would fly off the handle." Once while driving to the beach, a man cut Arey off, and "[Arey] just lost it, and he took out his gun and showed him the gun, and the guy slammed on the brakes and went back." Another time, someone threw a strawberry at M.Y. while he walked down the street, and Arey got his car and chased the person "all round Tulare" with M.Y. in the car.

M.Y. recalled that Arey told him during their relationship that their activities were "part of growing up and being a man, and this is what men do, and so if [M.Y.] wanted to be a man, this is what we do." Arey said it was the same type of relationship he had with Little Kevin. After M.Y. disclosed his abuse to police, he asked Little Kevin if something had happened between him and Arey, but Little Kevin was unwilling to talk to M.Y. M.Y. asked Little Kevin to speak with police but he does not know if Little Kevin did.

M.Y. never spoke with J.S. about the night Arey had them play the sex game and never told her about things Arey did to him.

M.Y. got married and became a pastor. The first person M.Y. told about the abuse was his wife. He told her in 2014 right before they got married. He testified he did not tell police because he felt confident Arey was not abusing anyone else, and he also said he was afraid of what might happen to him if Arey found out he reported the abuse to police. In 2019, while serving as a pastor, a family reported to him their daughter had been "severely sexually abused." This impacted him and prompted him to speak with his wife. He told her he did not want to have another one of his parents die before he was "able to get this off [his] chest." His wife suggested he speak with his mother, and he did so the next day. His mother "almost fell to the ground" when M.Y. told her about the

9.

abuse, and she confronted Arey at his house that day. M.Y. reported the abuse to police in October 2019.[7]

M.Y. never told B.S. or J.S. about what he told police, and B.S. and J.S. also have not discussed with him any of the abuse they suffered. He also never told B.S. to lie about what happened to get Arey in trouble. M.Y. said he did not want to testify but said he did "to stand up for myself."

### B. B.S.'s testimony

B.S. met Arey when she was 6 or 7. Arey spent time at the S. and H. homes and did a lot of fun stuff with the kids, including skateboarding, snowboarding, camping, fishing, and tubing on his boat. She also saw Arey at church as he was an active member.

She described three instances of sexual abuse. The first incident happened when she was in the third or fourth grade. Arey told her to kiss another girl who was over at her house. They were in B.S.'s room, and the girl was B.S.'s age. B.S. kissed the girl as she was told to do, and B.S. started crying and looked back at Arey. Arey "pointed to do it again," and she did. The kissing was on the mouth and both girls cried.

B.S. also discussed the snowboarding trip she went on with M.Y. and Arey when she was 11 or 12 years old. She said she woke up in the middle of the night with Arey next to her and noticed she did not have bottoms on. Arey was "spooning" her. She felt his hands rubbing her butt and in between her legs. She "just sat frozen" and did not say anything. She does not know how her bottoms came off.

The next day they went to rent boots and snowboards, and the plan was to go down the bunny hill first and then a bigger run. She took the lift up the bunny hill but did not want to go down because her anus was hurting.[8] She eventually went down by sitting

---

[7] M.Y. could not recall the exact month he made his report, but the lead detective testified it was October 2019.

[8] She gave no testimony about why her anus was hurting.

on her snowboard and riding down like on a sled. She spent the rest of the day at the resort café until M.Y. and Arey finished and then cried the whole way home. Arey made her feel like she ruined the whole trip by not snowboarding, which made her feel worse. She never spoke with M.Y. about what happened the night before. The only person she spoke with about that incident was a detective.

The third incident she testified to involved a trip to Blockbuster with Arey. She was 8 or 9 years old, placing this incident before the snowboarding trip.[9] Her mom asked Arey to return a movie to Blockbuster, and B.S. said she would go with him. While driving, Arey had his erect penis out. He rubbed her hand on his penis until he ejaculated and then cleaned himself. They returned the movie and went back home. Asked why she did not tell anyone about this, she testified, "Because why would I tell on an adult?"

B.S. heard that M.Y. "had come forward with his trauma, and it made [her] feel strong enough to do the same." A detective was the first person she had ever told about her abuse. She spoke with the detective for one or two hours before she ended the interview and never talked with police again. She testified that she suffered additional abuse but was unwilling to share it. She stated that she was telling the truth in court and that no one had ever encouraged her to lie or make anything up.

On cross-examination, the defense introduced some of B.S.'s text messages. Two were between B.S. and J.S., one was between B.S. and Little Kevin, and three were between B.S., J.S., and Little Kevin. One of the text messages from J.S. to B.S. and Little Kevin was:

> "Hey, guys. So the detective just called me and he asked if either of you would be willing to talk to him and share what Steve has done to either of you. He basically said that if we could get one or two more people, we could most likely take this guy down, but as of now, it's just [M.Y.] and my word against Steve's. It's, like, two is not enough but three or four

---

[9] She told a detective she was in the sixth grade when this incident happened.

definitely means that it happened. The detective said he would be willing to drive out here and meet with us."[10]

Little Kevin never spoke with police.

In a text message to J.S., B.S. said that Arey had done something to her too and that J.S. is the only person she has ever told. B.S. messaged J.S. that she was sorry for what happened to J.S. and that she was there for her if she ever wanted to talk. B.S. told J.S. that J.S. was stronger than her. The other messages concerned the logistics of making reports to the police officers and how to hold Arey accountable. None of the texts disclosed details of abuse.

## C.    J.S.'s testimony

J.S. was close with B.S. Arey was her father's best friend. Her father brought Arey into their family because Arey did not have family with whom to spend time. Arey was a "cool guy" who everyone wanted to hang out with. Arey spent lots of time with the S. and H. families.

She described an incident one night after bible study. She and M.Y. asked to stay the night at Arey's home because he was the "fun guy." J.S.'s and M.Y.'s mothers agreed, and Arey, M.Y., and J.S. went to Arey's condominium. She was about 10 or 11.

At the condominium, someone suggested playing a game of truth or dare where truth was not an option. Arey made J.S. take her clothes off and pretend to have sex on an air mattress in the living room. She did not know what sex was. She hid under a blanket and removed her clothes, and Arey told her to start humping the air mattress. She said she did not know what that meant, so Arey talked her through it. She stayed under the blanket the whole time until she got dressed. Arey then made M.Y. hump the air mattress. J.S. kept her eyes closed while M.Y. humped the mattress because she knew it was wrong. Arey then told M.Y. and J.S. to pretend to have sex with each other by moving "up and down on top of each other." M.Y. and J.S. did as instructed.

_____

[10] J.S. went to police before B.S. did.

12.

Arey then said it was their turn to dare him to do something. She could not recall what they dared him to do, but she remembers it "wasn't anything bad." Arey objected to it and said it had to be "more than that," so they dared him to remove his clothes and hump the doorknob. Arey undressed and J.S. shut her eyes, but he said it was not fun if she was not looking at him. She kept her eyes closed, and he said, "Okay. Then I'm just gonna hump the doorknob."

After the game it was time for bed, and Arey said to J.S., "You're sleeping with me on the air mattress." She testified she "begged him to not make [her]" sleep with him. She told him she wanted to sleep on the couch with M.Y., but Arey said that was not a choice. While lying together on the mattress, Arey spooned her with his arms wrapped underneath her breasts. His erect penis was protruding into her lower back. She tried wiggling away, and he held her tighter. In the middle of the night while he slept, she got herself out of his arms and got onto the couch and slept with M.Y. The next morning it was as if nothing happened. She and M.Y. got dressed and left and never spoke about the night before.

The first person she told about the abuse was her husband in 2011. During a moment of sexual intimacy with her husband, her husband did something which brought back memories of being touched by Arey on the air mattress. She "freaked out" and told her husband she had something to tell him. She had always regretted not reporting her abuse because of the thought that she maybe could have saved someone else. She said she did not tell anyone when she was younger because Arey was her father's best friend and a law enforcement officer.

Debi called J.S. in 2019 and said that M.Y. had reported that something happened to him. J.S. believed it because of her own experience. After the call, her husband encouraged her to report what happened to her. She told Debi she believed M.Y. because the same thing happened to her. J.S. had not seen M.Y. since 2013, and she had left Tulare in 2016 when her parents divorced.

13.

J.S. drove to Tulare to file a police report. Later, on November 19, 2019, she spoke with a detective in her home. She allowed the detective to take screen shots of Facebook messages she exchanged with M.Y. and text messages she exchanged with B.S. M.Y. sent her a Facebook message, after she made her police report, saying he was proud of her for standing up. She did not tell M.Y. before making her report that she intended to go to police. She and M.Y. exchanged multiple messages about coming forward to police, but at no time did they ever encourage each other to report or tell each other what to say.

J.S. also received a text message from B.S. after J.S. made her police report. The message said, "I'm proud of you, and something happened to me, too, and I'll never repeat it and I will never say." Before this message, J.S. and B.S. had never spoken about what Arey had done to J.S. And as of the day of J.S.'s testimony, the two had never spoken about "the specifics" of what Arey did to J.S. She first got an "idea" of what B.S. said happened between her (B.S.) and Arey at the preliminary hearing in this case.

After her interview with the detective, she sent the text message to B.S. and Little Kevin about how they needed to get more people to take Arey down, that two reports were not enough.

No one ever asked J.S. to lie or make anything up about Arey, but she admitted encouraging Little Kevin and B.S. to come forward if they had suffered any abuse. She testified that she wants Arey to go to prison.

**D.     Child sexual abuse accommodation syndrome (CSAAS) evidence**

Dr. Blake Carmichael, a clinical psychologist, testified about child sexual abuse accommodation syndrome (CSAAS). He knew nothing about the facts of this case when he testified, and thus could not give an opinion on whether any of the alleged victims in this case were in fact abused.

Dr. Carmichael described the origins of CSAAS. It was developed as an educational tool by Dr. Roland Summit and his colleagues in the 1970s and 1980s to help

people understand children who have been sexually abused. There are many myths and misconceptions about sexually abused children which cause people to have misguided expectations about how child sexual abuse victims should behave.

Dr. Carmichael explained that since CSAAS is an educational tool, it cannot be used to determine whether a child has been abused. In fact, no such tool exists for determining whether abuse has occurred. As an educational tool, it is useful for helping people understand why abused children may act in unexpected ways. On the other hand, a diagnostic tool is one used to analyze a person's symptoms to determine whether they have a mental disorder. Diagnostic tools involve "checklists" of symptoms clinicians use to determine whether a person should be diagnosed with a mental disorder. "Child sexual abuse" is not a mental disorder.

There are five components to CSAAS: secrecy; helplessness; entrapment and accommodation; delayed, unconvincing, and conflicted disclosure; and recantation or retraction.

Secrecy involves the perpetrator establishing and maintaining secrecy. This can involve threatening or intimidating the child or making the child afraid that there would be bad consequences for disclosing abuse, but it can also involve leveraging the child's love for the perpetrator. For example, the child might feel responsible for the perpetrator getting into trouble as a consequence of disclosure.

Helplessness involves a bigger, stronger perpetrator abusing a vulnerable child. This is why child victims do not often bite, kick, or scream to ward off the perpetrator.

Entrapment and accommodation factors into how children cope with the abuse. Children will do ineffective things to stop the abuse or avoid the perpetrator. They will also disassociate during acts of abuse, which makes it harder for them to recall some of the details of the abuse. Children might not show outward displays of distress, sadness, or anger when discussing the abuse, and may instead appear stoic.

15.

The delayed and unconvincing disclosure component refers to the fact that lots of victims of child sexual abuse do not disclose for months or even years. Many will not disclose before turning 18. It is common for children to not divulge everything at once, and they may not remember peripheral details.

As to retraction, "a sizable minority" of children will experience negative consequences after disclosing and will recant to make the consequences go away.

Not all five CSAAS components will always be present in a child sexual abuse victim. Dr. Carmichael reiterated the components do not exist as a checklist, but as a framework for understanding the behavior of abuse victims. He also stated that he was not offering an opinion on whether any alleged victim in this case was showing any CSAAS components.

## II. Defense's case

### A. T.S.'s testimony

T.S. was born in 1987. He estimated he had joined M.Y. and Arey on more than 10 snowboarding trips. They sometimes stayed in a hotel, and they once stayed at a hotel with a pool in Mammoth. He does not remember snapping towels at each other or remember a time when swimming trunks were down, but he testified he was not circumcised. When asked if he remembered the three of them laying on the bed together, he said, "Absolutely not." He said they did not watch pornography together, masturbate together, or engage in oral sex with each other. He said he was 100 percent positive none of that happened.

He was very close with M.Y. and Arey and spent lots of time with Arey. He never saw Arey do anything inappropriate or sexual with anybody, nor did he ever hear Arey talk about sexual things. He said Arey "positively affected" his life as a boy. Arey gave him "the speak of a father" when he and M.Y. got in trouble. He never saw Arey "fly off the handle." Instead, Arey was always even tempered.

T.S. never noticed a change in M.Y.'s demeanor; M.Y. never became sullen, withdrawn, or depressed. M.Y. also never told him he was being abused by Arey.

Debi contacted him on Facebook, asking him to please contact detectives if he remembers anything. He told her nothing happened to him, and he said he would have come forward long ago if something did. He said he was sorry for what was going on.

### B.     Emigh family

Susan Emigh is Arey's older sister, her husband is Thomas, and her son is Ben. Susan has five children, and Arey was around her and her children all the time. Arey was not the type of man to fly into a rage, and instead was level-headed and well-suited for a career in corrections. She recalled a snowboarding trip in the early 2000s when Arey brought M.Y. and M.Y.'s sister to her house. She recalled that Ben went snowboarding with them.

Thomas recalled the visit with M.Y. and B.S. Arey had to convince B.S. to come inside the house. She was not happy and was making faces. Thomas thought Arey was reserved and easy going and not prone to losing his temper.

Ben grew up around Arey and did not believe he had a bad temper. Arey never did anything inappropriate with him or anyone else. He looked up to Arey, and Arey was a mentor and positive influence on him and his friends.

Ben recalled going on a snowboarding trip with Arey, M.Y., and B.S. to Kirkwood when he was 15 or 16. They picked him up at his parents' house. It was not his first time going with M.Y., but it was his first time with B.S. He and B.S. were close in age. He remembers the trip very well because of B.S.'s poor attitude; she made everything about her, which was frustrating. He testified it was not a good day on the mountain, as most of his day was spent with B.S. trying to get her to snowboard. He went with her on the bunny hill to help her out. She tried sliding down on her butt, went a few feet, gave up, and walked over to the chairlift and rode it back down. She was adamant about going down on the chairlift.

17.

**C.	Other witnesses**

Richard Kincaid, who was born in 1991, attended Valley Baptist Church with his family. He was in the youth group and knew Arey. He and his brother Nicholas stayed the night at Arey's house three or four times, and he also spent time at Arey's house with other church kids. Nothing inappropriate ever happened. He was 15 to 16 years old when he spent time with Arey, and he did not know M.Y., B.S., or J.S.

Robert Pentico knew Arey when Pentico was the lead pastor at Valley Baptist Church and Arey helped with the teen youth group. Arey was like a part of his family, and they spent lots of time together outside of church. Arey spent time with Pentico's daughter, Bethanie, when she was 8 to 14. Pentico never saw Arey do anything inappropriate and never heard of him touching any child. He also never saw Arey lose his temper.

Bethanie testified that she sometimes was alone with Arey and he never did or said anything that made her uncomfortable. She knew M.Y. and B.S. and never saw Arey do anything inappropriate to them. She also never saw Arey fly into a rage.

Andrew H. and Tyson H. were M.Y. and B.S.'s stepbrothers. They both testified. They lived in Porterville but visited their father, John, in Tulare every other weekend and spent time with their stepsiblings. They attended Valley Baptist Church with the H. family and saw that Arey was very much part of their family. Arey lived across the street from the H. family, and they never saw pornography at his house. Arey never acted inappropriately with them, and they never saw him act inappropriately with M.Y., B.S., or J.S. Andrew knew Arey to be calm and nice, and he never saw Arey in a rage.

M.B. met M.Y. at Valley Baptist Church and they dated when they were 12 and 13. She was in the youth group and Arey was the youth group pastor. M.Y. never told her that Arey had molested him, and she never got a weird feeling from Arey or felt he was dangerous. She never saw him do anything inappropriate to anyone. She and M.Y.

18.

would kiss in Arey's car, but Arey never did anything inappropriate to her or asked her to do anything sexual.

### D.     *Stoll* expert

Dr. Richard Blak is a clinical and forensic psychologist who conducted a *Stoll*[11] examination of Arey. Dr. Blak's opinion, based on Arey's self-reported psychological history, was that Arey does not have the personality clusters that are consistent with a convicted sex offender.

### E.     Memory expert

Dr. Bradley McAuliff, a professor of psychology, testified as an expert on child witness memory, suggestibility, and forensic interviewing. He did not interview any alleged victim in this case.

Dr. McAuliff explained that suggestibility is a broad term that refers to a collection of factors that influence a witness's memory. A concept directly related to suggestibility is source monitoring, which refers to the cognitive process of identifying the origin of a memory. Poor source monitoring can make a person more susceptible to being influenced by external suggestions or misinformation. When a person struggles to accurately identify the source of a memory, they are more likely to incorporate information from external suggestions, even if those suggestions are inaccurate, which causes false memories. Things that can affect suggestibility include being asked leading questions and being exposed to conversations or other source material about a topic.

A person may struggle to disentangle suggested memories from what actually happened. A delay between an event and the effort to recall it can make the

---

[11] In *People v. Stoll* (1989) 49 Cal.3d 1136 (*Stoll*), the California Supreme Court held that a defendant charged with child molestation has the right to introduce expert testimony from a psychologist who evaluated him and determined that the defendant's character is not consistent with that of a typical child molester. (*Id.* at pp. 1152–1161.) Such evidence constitutes character evidence that tends to show that the defendant did not commit the charged crime. (*Id.* at pp. 1154–1155.)

disentangling harder because the accuracy of encoded information deteriorates over time. After a long time, an adult trying to recall an event from childhood may recognize gaps in their memory and look to other information to fill the gaps, but they may unknowingly gap-fill with false information. Also, several similar events may get blended in a person's mind, and separating out the events later may be difficult.

Dr. McAuliff also described the concept of stereotype induction, which is "a belief about an individual that is based on generalized information." He explained that in a sexual abuse case, as word of the allegations spreads, a person may form the stereotype of the accused as "a bad guy who does bad things," and this can bias the person's evaluation of certain behaviors of the accused. For example, upon hearing that someone is a sex offender, a person may retrospectively interpret past interactions—such as hugs and smiles—as potentially sinister.

## DISCUSSION

### I. Admissibility of CSAAS evidence

Arey first contends that admission of Dr. Carmichael's testimony about CSAAS evidence deprived him of his right to due process and a fair trial. He argues that a trial court should be required to hold a hearing to determine the scientific acceptance and reliability of such evidence under *People v. Kelly* (1976) 17 Cal.3d 24 (*Kelly*) before admitting the testimony. He maintains that if the trial court had held such a hearing, it would have concluded that CSAAS is not a scientific theory that is generally accepted in the relevant scientific community and would have excluded the testimony. We join the other California appellate courts that have held that the admissibility of CSAAS evidence is not subject to the *Kelly* rule.

#### A. Background

In defense counsel's written motions in limine, counsel cited the California Supreme Court's holding in *People v. McAlpin* (1991) 53 Cal.3d 1289, 1301 (*McAlpin*) that CSAAS testimony is inadmissible to prove that abuse occurred but is admissible to

rehabilitate an alleged child victim's credibility when the defendant suggests the victim's conduct after the incident is inconsistent with their testimony claiming abuse. (*Id.* at pp. 1300–1301.) At the motions in limine hearing, counsel clarified that he was not objecting to the admission of CSAAS evidence, and that his written motion served to ensure that CSAAS evidence would not be used to prove the allegations. To that point, the prosecutor said that her CSAAS expert had not been told anything about this case and that she would not be eliciting an opinion from the expert on whether the victims had been abused. Defense counsel then said that CSAAS evidence would not become relevant unless the defense suggested that the victims' conduct after the alleged incidents was inconsistent with having been abused. The trial court agreed that CSAAS evidence is typically presented in rebuttal to such a suggestion by the defense but assumed that the defense would be making such suggestions here. The court said that when the CSAAS expert testifies, if defense counsel believes CSAAS testimony is not appropriate, counsel may object.

Counsel did not object when the CSAAS testimony was given. Still, Arey asserts for the first time his challenge to the CSAAS evidence based on the *Kelly* rule. The People assert that any objection to the CSAAS evidence is forfeited for failure to object. Arey counters that his claim is not forfeited because an objection would have been futile given the case law permitting the admission of CSAAS evidence. We reject Arey's claim on the merits and therefore need not address the forfeiture issue.

**B. Analysis**

The *Kelly* rule "conditions the admissibility of evidence based on a new scientific method of proof on a showing that the technique has been generally accepted as reliable in the scientific community in which it developed." (*People v. Shirley* (1982) 31 Cal.3d 18, 34.) The rule applies "only to expert testimony 'based, in whole or part, on a technique, process, or theory which is *new* to science and, even more so, the law.' " (*People v. Lapenias* (2021) 67 Cal.App.5th 162, 173 (*Lapenias*).) But the rule applies

only if "the unproven technique or procedure appears in both name and description to provide some definitive truth which the expert need only accurately recognize and relay to the jury. The most obvious examples are machines or procedures which analyze physical data." (*Stoll, supra,* 49 Cal.3d at p. 1156.)

This argument has been rejected by other courts, including in *Lapenias, supra,* 67 Cal.App.5th 162 and *People v. Munch* (2020) 52 Cal.App.5th 464 (*Munch*). The *Lapenias* court explained, "[T]he theory of CSAAS is not new. [Citation.] Further, CSAAS testimony does not purport to provide a definitive truth; rather, the expert testimony attempts to disabuse jurors of misconceptions they might hold about the conduct of children who have been sexually abused. In short, expert CSAAS testimony is not ' " 'scientific evidence' " ' subject to the *Kelly* rule." (*Lapenias*, at p. 173.) We agree with this analysis. (See also *Munch, supra,* 52 Cal.App.5th at pp. 472–473 [rejecting challenge to CSAAS evidence under the *Kelly* rule].)

CSAAS evidence is subject to exclusion under *Kelly* when offered " 'to prove that a molestation actually occurred,' " which is not why it was admitted here. (See *People v. Wells* (2004) 118 Cal.App.4th 179, 188 (*Wells*).) It was admitted here for the proper, limited purpose of rehabilitating the victims' credibility against Arey's anticipated suggestion that their delayed reporting of the alleged incidents is inconsistent with their testimony claiming abuse. (*McAlpin, supra,* 53 Cal.3d at p. 1301 [CSAAS evidence admissible to disabuse jury of misconceptions about how children react to molestation and to explain abused children's seemingly self-impeaching behavior]; see also *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 82 [testimony about "rape trauma syndrome" admissible to rehabilitate complaining witness's credibility against suggestion that her behavior after assault was inconsistent with her claim of having been raped].)

Arey urges us to part with the California jurisprudence that finds CSAAS testimony admissible for the purposes it was used here. He cites cases from out-of-state courts where courts have either severely restricted or entirely banned CSAAS evidence.

22.

But the California Supreme Court in *McAlpin, supra,* 53 Cal.3d 1289, held that CSAAS evidence is admissible in California for the purposes for which it was used here. (*Id.* at p. 1301.) We are bound by precedent from our Supreme Court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Arey suggests that this court, despite *McAlpin*, can hold CSAAS evidence inadmissible because the *McAlpin* court did not consider whether CSAAS evidence satisfies the *Kelly* test. We disagree and are bound by the Supreme Court.

## II. CALCRIM No. 1193

Arey argues the trial court erred in instructing the jury with the pattern CSAAS jury instruction, CALCRIM No. 1193. He contends the instruction improperly permits the use of CSAAS evidence to prove sexual abuse allegations true. We reject the claim.

A claim of instructional error is reviewed de novo to ascertain whether the instruction accurately states the applicable law. (*People v. Ramirez* (2023) 98 Cal.App.5th 175, 218 (*Ramirez*). We consider the challenged instruction " 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' " (*People v. Rivera* (2019) 7 Cal.5th 306, 326.) We assume that jurors understand and follow the court's instructions. (*People v. Ortiz* (2023) 96 Cal.App.5th 768, 816 (*Ortiz*).)

Over the defense's objection, the trial court instructed the jury with CALCRIM No. 1193 as follows:

> "You have heard testimony from Dr. Blake Carmichael regarding child sexual abuse accommodation syndrome.

> "Child sexual abuse accommodation syndrome relates to a pattern of behavior that may be present in child sexual abuse cases. Testimony as to the accommodation syndrome is offered only to explain certain behavior of an alleged victim of child sexual abuse.

23.

"Dr. Blake Carmichael's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him.

"You may consider this evidence only in deciding whether or not MY., BS, and/or JS.'s conduct was consistent with the conduct of someone who has been molested, and in evaluating the believability of their testimony."

Many California courts have upheld the language of CALCRIM No. 1193 as accurately informing the jury of the limited use of CSAAS evidence. (*People v. Gonzales* (2017) 16 Cal.App.5th 494, 504 (*Gonzales*); *Lapenias*, *supra*, 67 Cal.App.5th at pp. 175–176; *Ramirez, supra*, 98 Cal.App.5th at p. 219; *Ortiz, supra*, 96 Cal.App.5th at p. 816; *Munch*, *supra*, 52 Cal.App.5th at p. 474.) Still, Arey maintains the instruction violates the limitation prohibiting the use of CSAAS evidence to prove that the sexual abuse allegations are true. (See *Lapenias*, at p. 171 [CSAAS evidence not relevant to prove abuse allegations true].) He focuses on the instruction's last paragraph, asserting it effectively instructs jurors that they can rely on counterintuitive victim behavior to bolster the credibility of the victims and support an inference of guilt, violating the parameters of the use of the evidence. He complains that the instruction does not "offer jurors the option of rejecting CSAAS's explanation for a witness's conduct." That is, the instruction "does not acknowledge the possibility that" an alleged victim's self-impeaching behavior "could also accurately suggest that they were in fact lying." "The instruction thus points the jurors toward only one possible conclusion: appellant was guilty."

We disagree with Arey's argument. The instruction told the jurors that CSAAS evidence "is not evidence that the defendant committed any of the crimes charged against him" and could be used only for the stated limited purposes. This, when combined with Dr. Carmichael's testimony that CSAAS is not a diagnostic tool and is useful only to understand child reactions to sexual abuse, would not cause the jury to believe they could consider the CSAAS testimony as proof that Arey sexually abused the victims.

24.

The appellate court in *Gonzales, supra,* 16 Cal.App.5th 494 rejected an argument similar to Arey's. There, the court noted that CALCRIM No. 1193 "must be understood in the context" of the expert's testimony, which in that case stated that "CSAAS is not a tool to help diagnose whether a child has actually been abused." (*Gonzales*, at p. 503.) In this context, the court held, a reasonable juror would understand CALCRIM No. 1193 to mean that the jury could use the expert's testimony to conclude that the alleged victim's behavior "does not mean she lied when she said she was abused," not that the alleged victim "was, in fact, molested." (*Gonzales, supra,* at p. 504.) "The CSAAS evidence simply neutralizes the victim's apparently self-impeaching behavior. Thus, under CALCRIM No. 1193, a juror who believes [the expert's] testimony will find both that [the alleged victim's] apparently self-impeaching behavior does not affect her believability one way or the other, and that the CSAAS evidence does not show she had been molested. There is no conflict in the instruction." (*Ibid.*)

We agree with *Gonzales*'s reasoning and conclude that CALCRIM No. 1193 was properly given in this case.

## III.    CALCRIM Nos. 1191A and 1191B

Without objection, the trial court instructed the jury with CALCRIM Nos. 1191A and 1191B, which together told the jury it could consider uncharged and charged sex offenses to find Arey had the propensity to commit other charged sex crimes. Arey contends these instructions improperly allowed the victims to corroborate their own testimony. We conclude the trial court properly gave these instructions.

The CALCRIM No. 1191A instruction read:

> "The People presented evidence that the defendant committed the crimes of lewd and lascivious act upon a child that were not charged in this case. This crime is defined for you in these instructions.
>
> "You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged offense. Proof by a preponderance of the evidence is a different

25.

burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.

"If the People have not met this burden of proof, you must disregard this evidence entirely.

"If you decide that the defendant committed the uncharged offense, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit lewd and lascivious act upon a child, as charged here. If you conclude that the defendant committed the uncharged offense, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of the charged crimes.

"The People must still prove the charge and allegation beyond a reasonable doubt.

"Do not consider this evidence for any other purpose except for the limited purpose as discussed above."

The CALCRIM No. 1191B instruction read:

"The People presented evidence that the defendant committed the crimes of lewd and lascivious act upon a child that were charged in Count[s] 1–20.

"If the People have proved beyond a reasonable doubt that the defendant committed one or more of these crimes, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit the other sex offenses charged in this case.

"If you find that the defendant committed one or more of these crimes, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of another crime. The People must still prove each charge and allegation beyond a reasonable doubt."

## B.    Analysis

Citing *People v. Stanley* (1967) 67 Cal.2d 812 (*Stanley*) and *People v. Scott* (1978) 21 Cal.3d 284 (*Scott*), Arey contends that CALCRIM Nos. 1191A and 1191B lowered

the prosecution's burden of proof because they effectively permitted M.Y, J.S, and B.S. to corroborate their own accusations. (See *Stanley, supra,* 67 Cal.2d at p. 819 [victim's "testimony as to the other offenses, which was not corroborated by any other evidence, in no way strengthened his testimony as to the offenses charged"]; *Scott, supra* 21 Cal.3d at p. 297 ["Where the sole evidence of uncharged sexual conduct is the uncorroborated testimony of the prosecutrix herself, it is inadmissible since it contributes nothing to a determination of her credibility on the charged offenses and is highly prejudicial"].)

We disagree. *Stanley* and *Scott* are inapt because they predate Evidence Code section 1108 (added by Stats. 1995, ch. 439, § 2, p. 3429), which permits evidence that the defendant committed other sexual offenses, subject to Evidence Code section 352 analysis. "Prior to the enactment of [Evidence Code] section 1108, evidence of the defendant's disposition to commit a sex offense was generally excluded. [Citation.] After the enactment of [Evidence Code] section 1108, courts can no longer exclude such evidence as prejudicial per se, but must engage in a weighing process under [Evidence Code] section 352." (*Gonzales, supra,* 16 Cal.App.5th at pp. 501–502.) Arey's corroboration argument was negated by the Legislature when it enacted Evidence Code section 1108.

The instructive cases regarding Arey's corroboration argument are *People v. Villatoro* (2012) 54 Cal.4th 1152 (*Villatoro*) and *Gonzales, supra,* 16 Cal.App.5th 494. In *Villatoro*, our Supreme Court concluded that Evidence Code section 1108 permits a jury to consider both charged and uncharged offenses to infer propensity. (*Villatoro, supra,* 54 Cal.4th at pp. 1163–1164.) In *Gonzales*, a divided panel concluded that former CALCRIM No. 1191, which is substantially identical to current CALCRIM No. 1191A, did not violate the defendant's due process rights. (*Gonzales*, at pp. 500–502.) The majority rejected the defendant's argument that the jury instruction irrationally allowed the jury to conclude the victim's testimony about uncharged misconduct could corroborate her testimony about the charged offenses. (*Id.* at p. 502.) The majority

concluded "there is nothing irrational about a victim supporting her testimony with testimony of uncharged sexual offenses.  We agree, however, that such testimony is not as probative as similar testimony from a third party.  But it is still probative."  (*Ibid*; see *People v. Ennis* (2010) 190 Cal.App.4th 721, 733 [upholding trial court's determination such evidence was more probative than unduly prejudicial].)  Thus, "CALCRIM No. 1191 does not violate due process."  (*Gonzales*, at p. 502.)

We agree with *Gonzales*'s reasoning and conclude that CALCRIM No. 1191A and 1191B were not improperly given.  In light of this conclusion on the merits of Arey's claim, we need not address forfeiture.[12]

## IV.     Opinion testimony of memory expert

As part of his challenge to M.Y.'s credibility, Arey called Dr. Bradley McAuliff to provide expert testimony on suggestibility as it affects memory and the accuracy of reports of abuse.  Arey contends the court erroneously restricted the scope of his testimony.  We disagree.

### A.     Background

Dr. McAuliff described circumstances affecting the reliability of memory, including the concept of stereotype induction—a psychological phenomenon where generalized beliefs about a person affect how their behavior is interpreted.  After he described this concept, defense counsel asked:

> "So stereotype induction if—in my layman's understanding is where you could have a group of people.  They get together, and they have a group interaction, and they talk about a particular case, and let's say— hypothetical, let's say there's three of them.  They're all—one comes forward 20 years later—this is eight to 13 when the alleged abuse happened.  So 20, 25 years later, he comes forward, and he has people that

---

[12] The People contend this claim of instructional error was forfeited for failure to object but acknowledge that an appellate court may consider instructional errors that affect a defendant's substantial rights.  (§ 1259.)  Arey responds that his substantial rights were affected and thus urges this court to address his claim under section 1259.

he's close to, and they come forward and they say something happened to me, too. Would that be suspect under the stereotype induction situation?"

The prosecutor objected to the hypothetical question, arguing it suggested the alleged victims in this case had false memories, which would infringe on the jury's role in determining credibility. Defense counsel asserted the question was proper because he did not use the alleged victims' names and the question tracked the facts of the case. The trial court sided with the prosecution, finding the question impermissibly called for Dr. McAuliff's opinion on the alleged victims' credibility. The court stated that credibility determinations were for the jury to make.

### B. Analysis

Arey argues on appeal the trial court abused its discretion by precluding Dr. McAuliff from responding to the hypothetical question. We disagree.

" 'California law permits a person with "special knowledge, skill, experience, training, or education" in a particular field to qualify as an expert witness (Evid. Code, § 720) and to give testimony in the form of an opinion (*id.*, § 801). Under Evidence Code section 801, expert opinion testimony is admissible only if the subject matter of the testimony is "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." ' " (*People v. Vang* (2011) 52 Cal.4th 1038, 1044.) "[T]he pertinent question is whether, even if jurors have some knowledge of the subject matter, expert opinion testimony would assist the jury." (*People v. Prince* (2007) 40 Cal.4th 1179, 1222.)

" '[T]he rationale for admitting opinion testimony is that it will assist the jury in reaching a conclusion called for by the case. "Where the jury is just as competent as the expert to consider and weigh the evidence and draw the necessary conclusions, then the need for expert testimony evaporates." ' " (*Summers v. A.L. Gilbert Co.* (1999) 69 Cal.App.4th 1155, 1183.)

" 'When expert opinion is offered, much must be left to the trial court's discretion.' " (*People v. Sanchez* (2019) 7 Cal.5th 14, 46 (*Sanchez*).) " 'The general rule is that an expert may not give an opinion whether a witness is telling the truth, for the determination of credibility is not a subject sufficiently beyond common experience that the expert's opinion would assist the trier of fact; in other words, the jury generally is as well equipped as the expert to discern whether a witness is being truthful.' " (*Ibid*; *People v. Sergill* (1982) 138 Cal.App.3d 34, 39 [abuse of discretion to *admit* expert opinion that a witness was credible].) "[A]ny ruling by a trial court on the admissibility of evidence" is reviewed for abuse of discretion. (*People v. Waidla* (2000) 22 Cal.4th 690, 717.)

In *Wells, supra,* 118 Cal.App.4th 179, the defense sought to introduce the testimony of an expert who would "testify that [the victim] did not exhibit the emotional reaction one would expect from a petite girl who had been raped by a large man. Based on her experience working with trauma victims, [the expert] believed [the victim's] demeanor was inconsistent with having suffered trauma." (*Id.* at p. 187.) The appellate court held the evidence was properly excluded. (*Id.* at p. 189.) The proposed testimony applied the expert's opinion about the usual reactions of a trauma victim to the actual behavior of the alleged victim. (*Ibid.*) The jury would easily have understood the testimony as a veiled opinion that since the victim did not exhibit the usual behavior she had not actually been molested. (*Id.* at p. 190.)

Similarly, in "*People v. Page* [(1991)] 2 Cal.App.4th 161 …, an expert testified about factors that could cause a false confession. The Court of Appeal held that the trial court acted properly in not additionally permitting the expert 'to discuss the particular evidence in this case or to give his opinion regarding the overall reliability of the confession.' [Citation.] It was for the jury, not an expert, to determine the reliability of the actual confession." (*Sanchez, supra,* 7 Cal.5th at p. 46 [concluding an expert may

testify about factors the jury should consider, "and then leav[e] it to the jury to apply that testimony to the actual facts"].)

Here, Dr. McAuliff was properly permitted to testify about stereotype induction and other circumstances affecting memory reliability. But the hypothetical question defense counsel asked was a step too far. The jury would have easily understood the question as a veiled attempt to get Mr. McAuliff's opinion on the reliability of the alleged victims' credibility. The jury, after hearing Dr. McAuliff's testimony about relevant circumstances affecting memory, was as well-equipped as Dr. McAuliff to assess the reliability of the victims' memories. Allowing Dr. McAuliff to answer defense counsel's hypothetical question would have trespassed on the jury's factfinding function, and thus the trial court properly excluded that testimony.

## V. Cumulative error

Arey contends if none of the errors described in his first four claims were prejudicial in isolation, their cumulative effects were. But we have found no error to cumulate.

## VI. Penal Code section 294 restitution fine

The trial court ordered Arey to pay a $1,000 restitution fine under section 294, subdivision (b). This subdivision permits a court to impose a restitution fine on any person convicted of violating section 261, 264.1, 285, 286, 287, or former section 288a, where the minor is under 14 years of age. Arey correctly asserts, and the People agree, that this fine is unauthorized and must be stricken because Arey was not convicted under any of these statutes. Indeed, all 20 of his convictions are under section 288.

As an aside, we note that Arey's challenge to this fine is cognizable on appeal, even though he did not object to it below, because it was an unauthorized fine. (*People v. Scott* (1994) 9 Cal.4th 331, 354.)

31.

## VII. Victim relocation expenses

Arey contends the trial court's order of restitution for $12,161.46 of relocation expenses for J.S. violated section 1202.4, subdivision (f)(3)(I), because there was no verification by law enforcement that those expenses were necessary for the personal safety of the victim, or from a mental health treatment provider that the expenses were necessary for the emotional well-being of the victim. He asserts the order for relocation expenses should be stricken and the matter remanded for a rehearing on the issue. The People in their initial briefing conceded the error and agreed with Arey that remand is required. But in response to our request for supplemental briefing on whether Arey's appellate claim was forfeited for failure to object below, the People rescinded their concession and asserted the claim is forfeited. As we will explain, the claim is not forfeited, and we agree with Arey that the order for relocation expenses must be stricken.

Section 1202.4, subdivision (f)(3)(I), provides that recoverable restitution costs include "[e]xpenses incurred by an adult victim in relocating away from the defendant, including, but not limited to, deposits for utilities and telephone service, deposits for rental housing, temporary lodging and food expenses, clothing, and personal items." The subdivision, however, requires that such relocation costs "be verified by law enforcement to be necessary for the personal safety of the victim or by a mental health treatment provider to be necessary for the emotional well-being of the victim." (*Ibid.*)

In her written statement submitted ahead of the restitution hearing, J.S. stated that she and her husband and children had moved out of state in April 2022. She said that moving out of state "was the best thing for my mental health and my overall well-being." She said she was seeking restitution for her relocation expenses because Arey "was a big factor in why [they] moved out of state." She said she "no longer wanted to live in fear of this man." She added, "We tried to wait for [the] case to go to trial before making the move across the country, but my quality of life was getting worse so we made the move." Her written statement requested $12,161 in restitution for relocation expenses, and

attached was a ledger of expenses totaling $12,161.46. The prosecution's motion for victim restitution included J.S.'s claim for $12,161.46 of relocation expenses and the ledger. No verification from law enforcement or a mental health treatment provider was provided for the expenses, either before or at the restitution hearing.

Defense counsel's written opposition to the People's restitution motion challenged the relocation expenses claim for two independent reasons. First, the documentation of the expenses was insufficient because the only documentary evidence submitted to substantiate them—the ledger—was inadmissible. Second, "no evidence" showed that Arey's conduct was a " 'substantial factor' in the move." The written opposition did not expressly challenge the expenses on the ground they were unverified.

No testimony was offered at the hearing. The court found the expenses were "supported by extensive documentation and J.S.'s explanation of how and why her decision to move came about in response to the proceedings in this case. So I think that request is supported."

On appeal, Arey challenges the relocation expenses award on the sole ground that they were unverified by either law enforcement or a mental health treatment provider. Since Arey did not expressly mention the verification requirement below, we requested supplemental briefing from the parties as to whether Arey's sole appellate claim is forfeited. In their respective supplemental briefs, Arey argues the issue was preserved and the People argue it was not.

We conclude the claim was preserved below by defense counsel's written opposition, which asserted that "no evidence" showed Arey's conduct was a " 'substantial factor' " in J.S.'s decision to move. The verification requirement is itself a form of evidence necessary to support an award of relocation expenses. Because verification is a statutory precondition and evidentiary component of such an award, the defense's argument that there was "no evidence" suffices to preserve the claim on appeal.

On the merits of Arey's claim, J.S.'s victim impact statement made clear that the move was for her mental well-being, bringing her relocation expenses claim squarely within section 1202.4, subdivision (f)(3)(I). Because no mental health treatment provider verified that the relocation expenses were necessary, the statute does not permit these expenses to be awarded. Accordingly, the $12,161.46 of relocation expenses must be stricken from the restitution order, and the matter must be remanded for a rehearing on that item.

## VIII. Noneconomic damages

When a defendant is convicted of a felony violation of section 288, 288.5, or 288.7, the court may award restitution for "[n]oneconomic losses, including, but not limited to, psychological harm." (§ 1202.4, subd. (f)(3)(F).) Under this provision, the trial court granted the prosecution's request for an award of $250,000 of noneconomic damages to each of the three victims for their "pain and suffering." On appeal, Arey contends the trial court abused its discretion in awarding $250,000 of noneconomic damages to each victim. But as we will explain, his appellate claims as to the noneconomic damages award are forfeited.

### A. Background

#### 1. The victims' impact statements

J.S. and M.Y. submitted victim impact statements before sentencing. J.S. also spoke at the sentencing hearing, and a victim advocate read a statement prepared by M.Y. B.S. made no statement.

J.S., in her written statement, said she was always nervous about coming forward. She was scared of "standing up" to Arey, who she described as "badge heavy." She said the past three and a half years since coming forward had been "anything but easy." During that time, she would drive around her block several times making sure Arey was not there. She also stayed vigilant while out in public, fearing Arey may be "lurking around the corner." She was anxious and suffered panic attacks. The constant fear led

34.

her to move out of state with her family.  She was still in therapy, and it was helping her heal.  She said Arey had stolen her innocence.

In her oral statement at the hearing, J.S. added that in the years since reporting her abuse, she was anxious at events with lots of people, fearing Arey would hurt her husband and children.  She said that if Arey were ever released from prison, it would "send [her] back into a fearful state that I was in when he was roaming free" on bail.

Ahead of the restitution hearing, J.S. submitted another written statement which tracked her previous statements as to her psychological harm.  This statement contained her request for relocation expenses, a reimbursement request for therapy bills, and $7,000 for her pain and suffering.

M.Y., in his written statement, said he spent many years feeling scared and ashamed before disclosing his abuse.  He tried running away from the memories and numbing himself to the nightmares.  But in late summer 2019, he could no longer "outrun the darkness."  He found it harder to do his job as a pastor and be of service to people.

After reporting his abuse to police, M.Y. stopped going to the grocery store, the gas station, and any other place where he had a memory of Arey taking him.  M.Y. had anxiety attacks and became a shell of his former self.  He began taking anti-depressant medication, but it did not help.  He eventually had to be hospitalized for trauma-induced psychosis.  Then he began therapy and seeing a psychiatrist to manage his psychosis.  He was placed on anti-psychotic medication and given time off work until he could manage his responsibilities again.  But after continued therapy, he realized he was unable to resume his position as pastor of his church, so he stepped down.  With the loss of the job came the loss of what was left of his identity.  He had to apply for disability benefits. The long court process stripped him of his mental stability, the financial stability of his family, and his sense of safety.  He was hospitalized again after suffering a second psychotic episode.  He is still nowhere near where he wants to be health-wise.  Arey stole not only his childhood, but also what could have been beautiful years with his wife,

children, and ministry.  He sometimes wishes he never came forward because of how much he has lost by doing so.

M.Y.'s oral statement at sentencing tracked his written statement.

### 2.      *The People's motion and the defense's opposition*

Ahead of the October 27, 2023, restitution hearing, the People filed a "motion to impose victim restitution."  They requested a restitution order for M.Y.'s lost income, J.S.'s relocation expenses, noneconomic damages for the psychological harm suffered by the three victims, and reimbursement to the California Victim Compensation Board.  The People attached documents to prove the lost income and relocation expenses and also attached J.S.'s letter she prepared for purposes of the restitution hearing.

The People, relying on section 1202.4, subdivision (f)(3)(F), requested $250,000 in noneconomic damages for each victim, totaling $750,000.  They derived the $750,000 figure from *People v. Smith* (2011) 198 Cal.App.4th 415 (*Smith*).  In that case, the evidence showed the defendant molested his stepdaughter almost daily for years.  (*Id.* at pp. 420–421.)  "The evidence presented at the restitution hearing established that defendant not only molested Doe, as established by defendant's convictions, but also isolated her and took advantage of a position of trust from the time she was eight years old until she left the home as an adult.  She was still having nightmares and flashbacks concerning the abuse.  And she had been in therapy to deal with the problems caused by the abuse.  She was having difficulty keeping jobs, and, at age 30 at the time of the hearing, had not finished her education, still attending Folsom Lake College.  She twice attempted suicide by overdosing on ibuprofen."  (*Id.* at p. 432.)  The trial court awarded $750,000 in noneconomic damages—$50,000 per year for 15 years of molestation.  (*Id.* at p. 433.)

In determining whether the award was an abuse of discretion, the Court of Appeal in *Smith* explained that a restitution order for noneconomic damages is to be affirmed if it "does not, at first blush, shock the conscience or suggest passion, prejudice or corruption

on the part of the trial court." (*Smith, supra,* 198 Cal.App.4th at pp. 433, 436–437.) The court held the award of $750,000—$50,000 per year for 15 years of molestation—did not shock the conscience and thus was not an abuse of discretion. (*Ibid.*)

The People asserted that "[g]iven the extent of psychological harm described by each child, $250,000 for each victim in no way shocks the conscience or suggests that there is any prejudice or corruption by the court." They anticipated that Arey would likely argue that an equal award to all victims is unjustifiable given the disparity in the length and severity of the abuse between the three of them. To that point, they stated that the length of time of abuse is informative, but not dispositive, in determining the victims' psychological harm. They said that the victims' psychological harm did not end when the abuse ended and that their lifetime of pain and suffering should be accounted for.

Defense counsel submitted a written opposition in which he challenged all of the requested restitution items except for the reimbursement to the Victim Compensation Board. The section on noneconomic damages read:

> "As to the People's request to impose a total of $250,000 in non-economic damages (pain and suffering) for each of the three victims in this case, for a total of $750,000, it is agreed that this Court enjoys very broad discretion in imposing said damages under current state law. However, this Court's finding must nevertheless be rationally based and must not 'shock the conscience.'
>
> "Defendant respectfully submits that the Court simply does not have sufficient evidence before it upon which to base a rational finding of $250,000 for each of the three victims. Defendant's acts differed very widely between the three victims, the ongoing emotional effects were not substantiated fully, and consequently it is difficult to see upon what the figure of $250,000 each is based.
>
> "Defendant therefore respectfully requests the Court to deny the award of pain and suffering, at least pending further testimony on this matter."

As to the restitution request for J.S.'s relocation expenses, which we have already addressed in issue VII, the defense argued that (1) the expenses were not substantiated by

37.

admissible evidence and that (2) "no evidence" showed Arey was a "substantial factor" in J.S.'s desire to move. Similarly, as to the request for M.Y.'s lost income, the defense argued that (1) no admissible evidence substantiated the requested amount and that (2) the connection between the abuse and M.Y.'s inability to work was too temporally remote to support a finding of proximate causation.

### 3. *The restitution hearing*

The trial court began the restitution hearing by stating that it had read and considered the People's motion and the defense's opposition and asking if the parties intended to offer any other evidence. The People said they were submitting on what they had filed. Defense counsel also submitted on the filings and asked the court if it had questions for him. The court asked counsel, "As I take it, your objections here essentially go to the foundation for these requests. You also argue that these documents amount to hearsay … and shouldn't be considered by the court?" Counsel said yes. The court overruled the hearsay objection, explaining that "restitution hearings are considered part of sentencing proceedings at which the typical rules of evidence do not necessarily apply." The court added, "As to the foundation, I think it's adequate. I think all of these requests are of the variety that the law recognizes, and they are supported by adequate documentation." The court thus overruled the foundation objection.

The court went on to award M.Y. his lost income and J.S. her relocation expenses. The court then said:

> "A new issue for me that was raised for the first time in this case, my experience, was the pain and suffering request. The People have put forth a figure of $750,000 which is $250,000 for each victim.

> "They've cited a case where a court ordered $750,000 under relatively similar circumstances to a single victim.

> "The analysis that I'm to engage in is whether or not the type of award shocks the conscience. I can't say that a quarter-million-dollar

38.

award for enduring the type of abuse that Mr. Arey was convicted of perpetrating in this case shocks my conscience.

"I acknowledge the inherit difficulty in putting a dollar amount on a harm of that kind, but it's something that happens all the time in our court system.

"If I think about it in terms of how much a reasonable person would be willing to pay to avoid having to go through something like this, $250,000 does not sound unreasonable to me. So I will make that order pursuant to the People's request, as well."

The court asked the prosecutor to prepare an abstract of restitution, and the prosecutor said she would. The court then asked, "Anything else today, counsel?" to which defense counsel responded no. The hearing ended.

**B.     Analysis**

Arey contends the trial court abused its discretion by ordering him to pay $250,000 in noneconomic restitution to each of the victims. He asserts three claims. First, the court erred by determining the noneconomic damages award based on a "reasonable person" standard rather than the actual psychological harm suffered by the victims. Second, the court erred by awarding equal noneconomic damages to all three victims despite significant differences in the frequency and severity of the abuse they experienced, without sufficient evidence to justify identical awards. And third, the court erred by failing to make specific factual findings on the record of the victims' psychological harm, rendering the basis for the noneconomic damages award unclear. These claims were all forfeited by failure to object at the restitution hearing.

*1.     Noneconomic restitution principles and standard of review*

" 'A restitution order is reviewed for abuse of discretion and will not be reversed unless it is arbitrary or capricious. [Citation.] No abuse of discretion will be found where there is a rational and factual basis for the amount of restitution ordered.' " (*People v. Lehman* (2016) 247 Cal.App.4th 795, 801.) "The court 'must demonstrate a rational basis for its award, and ensure that the record is sufficient to permit meaningful

39.

review.  The burden is on the party seeking restitution to provide an adequate factual basis for the claim.' " (*People v. Valenti* (2016) 243 Cal.App.4th 1140, 1182.)

In California, convicted criminals may be responsible for up to three types of restitution, two of which are relevant here.  (*People v. Giordano* (2007) 42 Cal.4th 644, 651 (*Giordano*).)  First, absent " 'compelling and extraordinary reasons,' " all convicted defendants must pay a restitution fine under section 1202.4, subdivision (b), based on the statutorily authorized amounts, " 'set at the discretion of the court and commensurate with the seriousness of the offense.' " (§ 1202.4, subd. (b)(1).)

"Second, when a defendant is convicted of a crime involving a victim who 'has suffered economic loss as a result of defendant's conduct[,]' the court must require the defendant to pay full restitution directly to the victim or victims of the crime[.]" (*Giordano, supra,* 42 Cal.4th at pp. 651–652, quoting § 1202.4, subd. (f).) "With one exception, restitution orders are limited to the victim's economic damages." (*Smith, supra,* 198 Cal.App.4th at p. 431.)  "Economic damages are 'objectively verifiable monetary losses including medical expenses, loss of earnings, burial costs, loss of use of property, costs of repair or replacement, costs of obtaining substitute domestic services, loss of employment and loss of business or employment opportunities.' [Citation.]" (*Ibid.*)

As noted above, the one exception to this rule is stated in section 1202.4, subdivision (f)(3)(F), which provides for the court to order the defendant to pay restitution for "*[n]oneconomic losses*, including, but not limited to, psychological harm, for felony violations of Section 288," which prohibits the commission of lewd or lascivious acts on minors.  (*Smith, supra,* 198 Cal.App.4th at p. 431, italics added.)  *Smith* further defined noneconomic damages as " 'subjective, non-monetary losses including, but not limited to, pain, suffering, inconvenience, mental suffering, emotional distress, loss of society and companionship, loss of consortium, injury to reputation and humiliation.' " (*Id.* at pp. 931–932.)

On an appeal from an order of restitution for economic loss, the reviewing court ordinarily looks for a " 'factual and rational basis for the amount of restitution ordered by the trial court[.]' " (*People v. Mearns* (2002) 97 Cal.App.4th 493, 499.)  In those situations, the trial court must employ an objectively reasonable and discernable methodology rather than simply basing the award on its subjective beliefs regarding the appropriate amount of compensation.  (*People v. Carbajal* (1995) 10 Cal.4th 1114, 1125.)

In contrast, *Smith* explained this standard was not applicable to review orders for noneconomic restitution because "[u]nlike restitution for economic loss … loss for noneconomic [harm] is subjectively quantified." (*Smith, supra,* 198 Cal.App.4th at p. 436.)  In light of the fundamental difference between the two types of loss, *Smith* held that a different standard of review must be applied to orders of noneconomic restitution to allow for the subjective considerations of the trial court judge.  (*Ibid.*)  "We are guided in this matter by the civil jury instruction concerning noneconomic loss:  'No fixed standard exists for deciding the amount of these damages.  You must use your judgment to decide a reasonable amount based on the evidence and your common sense.'  [Citation.]" (*Ibid.*)

> "The obvious difference between the review of a civil award of noneconomic damages and a criminal restitution order for noneconomic damages is that the trial court, not a jury, makes the determination in the first instance.  Even with that difference in mind, we see no reason to adopt any other standard of review.  We therefore affirm a restitution order for noneconomic damages that does not, at first blush, shock the conscience or suggest passion, prejudice or corruption on the part of the trial court.

> "Admittedly, this standard is not as delimited as the review of a restitution order for economic damages.  By their nature, economic damages are quantifiable and thus awards of economic damages are readily reviewed for whether they are 'rationally designed to determine the … victim's economic loss.'  [Citation.]  Noneconomic damages, however, require more subjective considerations.  Thus, the different standard is justified." (*Smith, supra,* 198 Cal.App.4th at pp. 436–437.)

41.

## 2. *Forfeiture*

We requested supplemental briefing from the parties as to whether Arey's claims concerning the noneconomic damages award are forfeited. Arey asserts the claims were preserved by the arguments in the written opposition his counsel submitted below. The People, on the other hand, argue the claims are forfeited.

A defendant's failure to object on the specific legal ground later asserted forfeits that ground for appeal. (*Nadey, supra,* 16 Cal.5th 102, 1000; *Flinner, supra,* 10 Cal.5th at p. 726 [defendant forfeits argument on appeal when he objects on substantively different grounds]; *Partida, supra,* 37 Cal.4th at pp. 433–434.) Applying this principle of appellate procedure, Arey's three-part challenge to the noneconomic damages award is entirely forfeited because defense counsel failed to object to the trial court's reasoning at the restitution hearing. While the defense submitted a written opposition to the People's motion, that opposition responded only to the People's rationale—not the court's. The trial court ultimately adopted its own reasoning, grounding the award in a "reasonable person" standard rather than an individualized assessment of harm. When the court announced this methodology, it explicitly asked if either party had anything further to add. Defense counsel remained silent, thereby forfeiting any challenge to the court's analytical framework. The defense could not simply stand on its written opposition; it had an obligation to object to the court's pronouncement of the award if it intended to challenge the court's reasoning on appeal. We now address each of Arey's three appellate claims individually.

Arey's first claim—that the trial court erred by using a "reasonable person" standard rather than basing the award on the victims' actual suffering—is forfeited. The defense never objected to the court's methodology at the restitution hearing, despite being given the opportunity to do so. He thus cannot raise this issue for the first time on appeal.

42.

Because the first claim is forfeited, the second and third claims necessarily fall with it. The second claim asserts that the trial court failed to justify equal damages for each victim despite the varying degrees of abuse, but this argument presumes that the court was required to differentiate among the victims in the first place. That presumption, however, has no place in the methodology the trial court applied. While the defense made the argument about differentiating between the victims in its written opposition, it was based on an individualized harm approach the trial court ultimately did not use. Once the court applied a general, reasonable-person valuation, the defense needed to object to that framework. Because it did not, there is no basis to argue that the damages were improperly equal under an individualized harm framework.

The third claim, which asserts that the trial court failed to make specific factual findings about the victims' psychological harm, is likewise forfeited. Again, the trial court did not base the award on individualized harm but rather on a general, reasonable-person valuation of the abuse suffered. This methodology, by its nature, does not require detailed factual findings about each victim's psychological harm. The court explained its reasoning in terms of what a reasonable person would pay to avoid the abuse, not on individualized assessments of harm. If the defense believed specific findings were necessary under a different framework, it had to raise the issue at the hearing. By remaining silent, Arey's claim that the court failed to make findings was forfeited.

Ultimately, this entire line of attack is predicated on an argument the defense never raised at the restitution hearing, specifically regarding the trial court's reasoning and methodology for the noneconomic damages award. While the defense did challenge the uniformity of the damages in its written opposition, it did not object to the court's application of a "reasonable person" standard or its adoption of that framework. Arey had a clear opportunity to raise this objection at the hearing when the court articulated its reasoning, yet he failed to do so. Because Arey failed to preserve the first claim, the

second and third claims, which rely on the same underlying objection, are also forfeited. Under well-established forfeiture principles, Arey cannot raise these issues on appeal.

## DISPOSITION

The $1,000 restitution fine under section 294, subdivision (b), and the $12,161.46 of relocation expenses for J.S. under section 1202.4, subdivision (f)(3)(I), are stricken from the judgment.  The matter is remanded for a rehearing as to the relocation expenses. The judgment is otherwise affirmed.  After the proceedings on remand are concluded, the superior court clerk is to prepare an amended abstract of judgment and forward copies to the appropriate entities.


SNAUFFER, J.

WE CONCUR:


PEÑA, Acting P. J.


SMITH, J.